UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LAURIE JENKINS,

         Plaintiff     DECISION AND ORDER

-vs-
                 16-CV-6040 CJS

COMMISSIONER OF SOCIAL SECURITY,

         Defendant.
_____

APPEARANCES

For the Plaintiff:      Kenneth R. Hiller, Esq.
             Timothy Hiller. Esq.
             Law Offices of Kenneth Hiller
             60000 North Bailey Avenue, Suite 1A
             Amherst, New York 14226

For the Defendant:     Elizabeth Rothstein, Esq.
             Social Security Administration
             Office of General Counsel
             26 Federal Plaza, Room 3904
             New York, New York 10278

             Kathryn L. Smith, A.U.S.A.
             Office of the United States Attorney
             for the Western District of New York
             100 State Street
             Rochester, New York 14614

INTRODUCTION

   This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied the application of Laurie Jenkins ("Plaintiff") for Social Security Disability Insurance Benefits. Now before the Court is Plaintiff's motion (Docket No. [#10]) for

1

judgment on the pleadings and Defendant's cross-motion [#13] for judgment on the pleadings. Plaintiff's application is denied, Defendant's application is granted, and this action is dismissed.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts. The Court has reviewed the administrative record [#8] and will reference it only as necessary to explain this Decision and Order.

Plaintiff, born in 1959, claims to be disabled due to depression and migraine headaches, beginning on October 20, 2011. Prior to the alleged onset date, Plaintiff had earned her bachelor's degree in Organizational Management (341) and had held two executive-level jobs. Between approximately 2000 and 2005, Plaintiff worked as the Executive Director of the Southeast Ecumenical Ministries (a "food pantry and senior citizen transportation program") in Rochester. (346). Between approximately 2005 and October 2011, Plaintiff held the title of vice-president for the Creative Wellness Coalition, a mental-health services organization funded by Monroe County, New York. (343-346). In that position, Plaintiff supervised two employees and approximately fourteen volunteers. (344). When she was not working at those jobs, Plaintiff also operated a "hotdog stand" food cart that she owned, on an "as needed" basis for an auction company. (348-349, 354-356, 358).

In or about October 2011, Plaintiff was terminated from her job, which caused her a great deal of anger and resentment. (371). Subsequently, Plaintiff maintains that she resumed using alcohol as a coping mechanism. In that regard, Plaintiff had a

2

history of alcohol abuse, but had remained abstinent for 22 years. (135). The termination of Plaintiff's job in 2011 precipitated her return to abusing alcohol. (135) ("She is holding onto a lot of anger towards her old job, which triggers her drinking."). The resumption of alcohol usage also reportedly exacerbated her long-standing depression, which was otherwise sufficiently-controlled with medication to allow her to work. (80). Plaintiff has been prescribed medication to reduce her "urge to drink alcohol," but does not take it. (327). In that regard, Plaintiff indicates that she believes that she can drink without "abusing" alcohol, though she admits that she may be "in denial" about this. (362-363).

In October 2013, while her claim was still pending at the administrative level, Plaintiff began working full time as a janitor for a manufacturing corporation that owned several office buildings. (352-353). Plaintiff was responsible for maintaining one of the office buildings by herself, and also assisted other janitorial staff at various times with particular projects, such as moving office furniture. (316, 369). Plaintiff indicated that she enjoyed the job (363-364, 367, 370-371), which was far less stressful than her previous executive-level positions. (371). However, Plaintiff indicated that she sometimes missed work, due to having migraine headaches "once or twice a month." (366).[1]

At all relevant times, Plaintiff had a close relationship with her adult son, and she also provided assistance to her elderly mother, by taking her shopping regularly. (368). Plaintiff acknowledged that she had support from her family and at least one good

---

[1] Several months later, Plaintiff indicated that she was missing three-to-four days of work per months due to migraines, but there is no explanation for this alleged increase in frequency. (317).

friend. (246). Additionally, prior to 2012, Plaintiff had a live-in boyfriend for 18 years. (365). After that relationship ended, Plaintiff began dating again, and by January 2015, was engaged to be married. (178). Plaintiff also takes care of her two pet dogs. (365, 368). Plaintiff owns her own home and a rental property. (21, 315, 767).

The record contains three separate reports concerning Plaintiff's mental impairments and their effect on her ability to work. On October 2, 2012, Christine Ransom, Ph.D. ("Ransom") performed a one-time consultative psychological evaluation at the Commissioner's request. Plaintiff reportedly told Ransom that she had been receiving treatment for depression since 1999. (687). However, Plaintiff reportedly denied having any "drug and alcohol history." (688). After examining Plaintiff, Ransom offered the following opinion, in pertinent part:

> This individual will have moderate difficulty following and understanding simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule, learn simple new tasks. She will have moderate to marked difficulty performing complex tasks, relat[ing] adequately with others and appropriately deal[ing] with stress. Areas of difficulty are secondary to major depressive disorder currently moderate to marked, anxiety disorder NOS currently moderate to marked.

(689-690).

Approximately two months later, on November 27, 2012, Plaintiff was examined by Tara Russow, Ph.D. ("Russow"), in connection with vocational rehabilitation and training. (785-789). Russow performed a "comprehensive evaluation of intellectual and personality functioning," using a variety of testing methods. (785). Whereas Plaintiff reportedly did not disclose her alcohol problem to Ransom, she admitted to Russow

4

that she had "a history of . . . alcohol dependence." (785, 786).  Russow, stated, in pertinent part:

> Results of the MCMI-III personality testing indicate that Ms. Jenkins is not experiencing severe or acute difficulties of clinical nature at this time, which may reflect the efficacy of her current treatment regimen.  There were no significant score elevations seen on the scales measuring somatization, mania, drug dependence, trauma, major depression, hallucinations, delusions, paranoia, or any form of psychosis.  There were mild elevations in her anxiety, dysthymia, and alcohol dependence scores, which is not unexpected given her situation and history.

(787).  Russow indicated that IQ testing showed that Plaintiff is in the average range of intelligence. (787).  Russow continued:

> Ms. Jenkins demonstrated excellent planning ability, social awareness, pattern recognition, judgment, knowledge of social convention, common sense, and evaluation of consequences even if she chooses to do otherwise.  Within the average ranges are her receptive & expressive language abilities, recall of words, logic & abstract reasoning, fund of knowledge, long-term memory, and crystallized intelligence.  Weaknesses are seen in her attention, concentration, immediate auditory memory, visualization, auditory perception & recall, sequencing ability, alertness to visual detail, ability to differentiate important from unimportant information, visual processing speed, motor speed, coordination, cognitive adaptation, learning flexibility, and visual perception & response to abstract designs & symbols.  Deficits are apparent in her other mathematical knowledge & calculations, numerical reasoning, abstract figure analysis & reconstruction abilities, visual-motor integration, and spatial relations capacity.

(788).  Russow opined that Plaintiff's "relapse into alcohol dependence [might] well undermine her efforts and those of her healthcare providers" to treat her depression. (788).  In sum, Russow concluded that Plaintiff was capable of working, but indicated that she could not help Plaintiff determine which type of work would be most suitable for

her unless and until she "attain[ed] sobriety." (789).

And finally, on November 14, 2013, Diane Morse, M.D. ("Morse") completed a "Mental Residual Functional Capacity Questionnaire." (800-804). Unlike Ransom and Russow, Morse was a treating physician. However, at the time she completed the report, Ransom had only met with Plaintiff on two or perhaps three occasions, as Plaintiff had just become a patient in or about May of 2013. Morse, an internal medicine physician, had agreed to write prescriptions for Plaintiff's mental health medications, based upon the recommendations of her colleague, Dr. Michael Privitera, M.D. ("Privitera"), a psychiatrist. (891) ("Patient is referred by Diane Morse MD who is willing to be ongoing prescriber after these consultations."). In any event, on November 14, 2013, Morse completed the aforementioned report, and indicated that Plaintiff was unable to work, due to "depression." (800-804). Morse opined that Plaintiff was taking medication but had "not improved yet." (800). Morse indicated, for example, that Plaintiff would have very significant restrictions in her ability to remember work procedures, understand and remember short and simple instructions, carry out simple instructions, and perform at a consistent pace. (802). Morse further stated that Plaintiff would be "off task" at work at least 20% of the time, and that her condition would worsen if she went to work, due to "more stress." (804).

## PROCEDURAL BACKGROUND

On July 5, 2012, Plaintiff applied for disability benefits, claiming to be disabled due to major depression, panic attacks and severe migraines. (374). On October 17, 2012, the Commissioner denied Plaintiff's application initially. On November 8, 2013, a hearing was conducted before an Administrative Law Judge ("ALJ"). The hearing was

6

continued on July 10, 2014. (307-372). On July 22, 2014, the ALJ issued his Decision, finding that Plaintiff was not disabled at any time between the alleged date of onset (October 20, 2011) and the date of his decision. Applying the familiar five-step sequential analysis used to evaluate social security disability claims, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity between October 20, 2011, and October 1, 2013, but that she engaged in substantial gainful activity after October 1, 2013. (294). At step two, the ALJ found that Plaintiff had two severe impairments: migraine headaches and major depressive disorder. (294). The ALJ further found that Plaintiff had the non-severe impairment of "substance abuse" (295), which did not prevent her from engaging in substantial gainful activity. (300). At step three, the ALJ found that Plaintiff's impairments did not meet-or-medically-equal a listed impairment. (295-296).

Before reaching step four of the sequential analysis, the ALJ found that Plaintiff had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels . . . "requiring a 'specific vocational level' [or 'SVP'] level of 5 or less." (296-300). In explaining that determination, the ALJ reviewed the medical evidence, including the reports by Ransom, Russow and Morse. (296-300).

The ALJ gave "some weight" to Ransom's opinion, finding that it was "generally consistent with the evidence of record." (298). However, the ALJ stated that Plaintiff's "limitations were not as great as indicated by Dr. Ransom," as shown by the fact that Plaintiff started a job relatively soon after Ransom's evaluation. (298). Specifically, Plaintiff worked as a patient-transport dispatcher at a hospital, between April 2013

7

through June 2013. (339, 351).[2] Plaintiff quit the dispatcher's job, apparently because it was too stressful,[3] but indicated that she would have liked to have continued working as a patient transporter if the hospital had allowed her to do so. (351-352). The ALJ indicated that this work attempt did not amount to substantial gainful activity, but nevertheless showed that Plaintiff's non-exertional impairments were not as severe as Ransom had indicated. (298, 299).

The ALJ gave "little weight" to Morse's opinion, stating, in pertinent part, that Morse "indicated that the claimant's condition would deteriorate if the claimant worked. Yet, at the time the doctor completed the questionnaire, the claimant was working at the level of substantial gainful activity." (299). In that regard, the ALJ was referring to the fact that Plaintiff had begun working as a janitor at least one month prior to Morse's report, in October 2013, and was still working in that position as of July 2014.

And finally, the ALJ gave "significant weight" to Russow's opinion, finding that it was "generally consistent with the evidence of record." (299). The ALJ stated, "in sum," that his RFC finding was supported by the medical evidence and "by the evidence of the claimant's own activities." (300).

At step four of the sequential analysis, the ALJ found that Plaintiff was capable of performing her past relevant work as a janitor/commercial cleaner. (300).

---

[2]See, (350-351) ("Q. And what were you doing there? A. Transporting patients and the dispatching. I did okay with transporting the patients, but the dispatching was really difficult. It was, you had all the transporters [(i.e., employees who transported patients within the hospital)], you had to coordinate all their transporting trips on the computer to go out to their pagers. So there was multiple, there were sometimes up to 20 transporters that you were sending the calls out to.").

[3]Plaintiff stated that the job was "too much," and that she would cry sometimes, but gave no specific explanation for why she quit the job.

8

Consequently, the ALJ found that Plaintiff was not disabled, without proceeding to step five of the sequential analysis.

Plaintiff appealed to the Appeals Council, and submitted additional medical records, covering the period November 13, 2014 to February 13, 2015. (2, 286). The records indicated that as of November 2014, Plaintiff was no longer working, and had resumed drinking alcohol heavily, which triggered her depression. (80). Plaintiff attended group therapy sessions for alcohol abuse. During one such session, Plaintiff indicated that "no one would hire her," but admitted that she was not actually attempting to obtain a job. (154). Plaintiff also began attending a stress-management therapy group. (166). On January 5, 2015, Plaintiff informed her counseling peer group that she had become engaged to be married. (178).

On December 3, 2015, the Appeals Council declined to review the ALJ's determination. The Appeals Council found that the additional medical records that Plaintiff had submitted did not pertain to the period covered by the ALJ's decision, but rather, pertained to "a later time." (2).

On January 26, 2016, Plaintiff commenced this action. On December 13, 2016, Plaintiff filed the subject motion [#10] for judgment on the pleadings, and on March 30, 2017, Defendant filed the subject cross-motion [#13] for judgment on the pleadings. On August 17, 2017, counsel for the parties appeared by telephone for oral argument.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the

9

Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

DISCUSSION

Plaintiff contends that this action must be remanded for two reasons: First, because the ALJ's RFC determination was erroneous; and second, because the medical evidence submitted to the Appeals Council, relating to the period following the ALJ's decision, "undermines" the ALJ's analysis of Dr. Morris's report dated November 14, 2013.[4] The Court finds, however, that neither argument has merit.

The RFC Determination Is Supported By Substantial Evidence

Plaintiff summarizes her first argument as being that, "[r]emand is necessary because the ALJ's mental RFC assessment stands in conflict with every medical opinion of record, and [because] the ALJ proffered virtually no explanation as to how he determined that [Plaintiff's] only limitation would be that she needed a job with an SVP level of 5 or less."[5] According to Plaintiff, the issue is whether the ALJ's RFC determination is "supported by substantial evidence."[6]

---

[4]During oral argument, Plaintiff also contended that the ALJ had not properly evaluated Plaintiff's alcohol-abuse impairment. However, the Court declines to consider that claim.

[5]Pl. Memo of Law [#10-1] at p. 1.

[6]Pl. Memo of Law [#10-1] at p. 19.

10

Preliminarily, Plaintiff's contention that the RFC determination is "in conflict with every medical opinion of record" is incorrect.⁷ Most notably, the RFC determination is *not* in conflict with the opinion of Dr. Russow, which is the only one of the three psychological reports to which the ALJ gave "significant weight." Russow, whose examination of Plaintiff was evidently more comprehensive than any conducted by Ransom or Morse, found that Plaintiff was only "mildly" anxious and dysthymic, and not significantly impaired by depressive symptoms. (787). Indeed, the clear issue raised by Russow's report was not *whether* Plaintiff could work, but which job would be most suitable for her. Plaintiff contends that Russow's opinion neither "conflicts" with Ransom's opinion nor "support[s] a finding that Ms. Jenkins was capable of work,"⁸ but the Court disagrees on both points.

Plaintiff nevertheless insists that remand is required because it is "not clear" what weight the ALJ gave to Ransom's report.⁹ According to Plaintiff, the ALJ's treatment of Ransom's report was "inconsistent," because he purportedly gave the opinion only "some weight," but also claimed that the report supported his RFC finding. Plaintiff further claims that the RFC finding actually "differ[s] markedly from Dr.

---

⁷Plaintiff's memorandum of law asserts that the ALJ referred to Ransom's opinion, but otherwise "faile[d] to list any other medical opinion relating to Ms. Jenkins' mental health which supported his assessment." Plaintiff cited page 300 of the record for that proposition, and upon checking that cite, it appears that she was referring to the following statement by the ALJ: "In sum, the above [RFC] assessment is supported by the opinions of Dr. Huffer, Dr. Toor, and Dr. Ransom." (300). Of those three, only Ransom opined concerning Plaintiff's mental impairments. However, insofar as that statement by the ALJ did not also include a reference to Russow, it was apparently a typo or oversight, since the ALJ expresssly gave more weight to Russow's opinion than to Ransom's. Consequently, Plaintiff's attempt to argue that the ALJ based his mental RFC determination solely on Ransom's report is unavailing.

⁸Pl. Memo of Law [#10-1] at pp. 22-23.

⁹Pl. Memo of Law [#10-1] at p. 20.

Ransom's opinion."[10]

It is questionable whether the ALJ should have given much weight at all to Ransom's report, since it was based upon inaccurate information provided by Plaintiff. To be clear, Ransom's report indicates that Plaintiff denied any drug or alcohol history (688), which would have been plainly untrue, since Plaintiff has a history of both alcohol and drug abuse, and at the time of Ransom's evaluation she was actively abusing alcohol and using marijuana. (659, 699, 700).[11] Consequently, Plaintiff prevented Ransom from performing an accurate evaluation. Nor is Ransom's report particularly consistent with the rest of the record, despite what the ALJ indicated. For example, Ransom found that Plaintiff's attention, concentration and memory were "moderately impaired," but treatment notes from the same period routinely stated that Plaintiff's attention, concentration and memory were "good." (654, 669, 670, 700). Similarly, Ransom reported that Plaintiff did "not socialize with anyone but her son and her mother" (688), but treatment records routinely indicated that Plaintiff had "good interpersonal relationships" (767, 654) and socialized with friends. (246, 668, 670, 696, 703, 713, 720, 722, 724, 905).

In any event, Ransom's report did not indicate that Plaintiff was precluded from working, as Plaintiff seems to suggest. Rather it merely opined, in pertinent part, that Plaintiff would have moderate difficulty with simple tasks, and moderate-to-marked difficult with complex tasks, both of which predictions were dis-proven when Plaintiff

---

[10] Pl. Memo of Law [#10-1] at p. 20.

[11] Ransom's report further suggests that Plaintiff referred to having "lost 30 pounds in the past one year" as evidence of depression. (687). However, the record indicates that Plaintiff intentionally lost such weight using the Weight Watchers program. (662, 700).

12

subsequently performed her janitorial job – which required her to clean an entire office building independently – at the level of substantial gainful activity, with no apparent difficulty. The ALJ indicated that he gave some weight to Ransom's opinion concerning Plaintiff's condition at the time, but found that it was partially dis-proven by Plaintiff's subsequent stint working at the hospital.

Plaintiff nevertheless insists that remand is required because the ALJ's decision is incapable of meaningful review because it fails to explain how the ALJ concluded that Plaintiff was capable of performing jobs with "an SVP of 5 or less."[12] While the Court agrees that the ALJ could have done a better job of explaining his reasoning, it does not agree that the decision precludes meaningful review. Rather, it appears that the ALJ chose that RFC because Plaintiff was actually working within that SVP range, at the level of substantial gainful activity, despite her alleged impairments. In that regard, the vocational expert ("VE") testified that Plaintiff's prior executive-level jobs were both considered "highly skilled" with SVPs of 8, while her janitorial job had an SVP of 2. (329-330). The ALJ then asked the VE a hypothetical question, namely, whether a person of Plaintiff's age, education level and work experience, with no physical limitations, but with mental limitations restricting her to jobs with an SVP of 5 or less, could perform any of Plaintiff's past work, including the janitorial job that she was actually performing at that time. (330-331). The VE responded that the hypothetical individual could perform Plaintiff's janitorial job. (331).

It further appears that the ALJ chose the SVP of 5 or less because he found

---

[12]Pl. Memo of Law [#10-1] at p. 23.

13

Plaintiff's statements about her mental impairments to be partially credible. (297).
Thus, the ALJ agreed that Plaintiff could not perform her past "highly skilled" work (SVP 8), but found that she could still perform work that was less skilled, and was in fact doing so.  The ALJ explained the RFC finding, by discussing why the medical evidence and Plaintiff's activities of daily living, including the fact that she was engaged in substantial gainful activity, were not entirely consistent with her complaints. (296-300).  The RFC determination is supported by substantial evidence.

### The Evidence Submitted to the Appeals Council Does not Undermine The ALJ's Treatment of Dr. Morse's Report

As previously mentioned, on November 14, 2013, Dr. Morse completed a Mental Residual Functional Capacity Questionnaire (800) that strongly supported Plaintiff's claim to disabled due to depression.  The report indicated, for example, that Plaintiff had "severe, persistent depression [that was] unresponsive to medications," which would cause her to be off-task at work approximately 20% of the time and to miss more than four days of work per month. (803-804).  It is undisputed that if a claimant actually had such limitations, she would be disabled.  However, the ALJ gave little weight to this report, stating:

> I give little weight to the opinion of Dr. Morse.  The doctor indicated that the claimant's condition would deteriorate if the claimant worked.  Yet, at the time the doctor completed the questionnaire, the claimant was working at the level of substantial gainful activity.

(299).  In that regard, the ALJ correctly observed that at the very time Dr. Morse was writing her opinion, Plaintiff was happily employed full-time as a janitor.  Indeed, on November 8, 2013, just five days before Dr. Morse completed her report, Plaintiff

appeared before the ALJ and testified that she had been working at the cleaner's job for approximately one month, and that the job was "great" and not stressful. (339-340, 352-353, 367-371). When the hearing resumed in July 2014, Plaintiff was still working at the same job. Plaintiff expressed concern that she was using up too many sick days due to her migraine headaches, but otherwise was not having difficulty performing the job.

On July 22, 2014, the ALJ issued his decision, finding that Plaintiff was not disabled at any time between that date and the alleged onset date, October 20, 2011. Subsequently, Plaintiff submitted to the Appeals Council medical records pertaining to the period November 13, 2014 through February 13, 2015. (2). In other words, the records pertained to the period beginning approximately four months after the ALJ issued his decision. In any event, the records indicated, *inter alia*, that by mid-November 2014, Plaintiff was no longer working at her janitor's position. Plaintiff contends that such evidence is "new and material," and "undermines" the ALJ's finding concerning the weight to be afforded to Dr. Morse's report. In particular, Plaintiff contends that Morse's report accurately "predicted" that she would "detonate" if she returned to work. Plaintiff notes that the Appeals Council declined to consider the new evidence, after finding that it "relate[d] to a later time period." Plaintiff suggests that the Appeals Council was wrong in doing so, though she does not really explain why, and urges the Court to rely upon this evidence to reverse the Commissioner's decision.

However, the Court disagrees. The general applicable legal principle is clear:

> New evidence submitted to the Appeals Council following the ALJ's
> decision becomes part of the administrative record for judicial review

15

> when the Appeals Council denies review of the ALJ's decision. The only
> limitations stated in 20 C.F.R. §§ 404.970(b) and 416.1470(b) are that the
> evidence must be new and material and that it must relate to the period
> on or before the ALJ's decision.

*Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (citations and internal quotation marks omitted).

> Importantly, new evidence post-dating the Commissioner's decision is not
> necessarily irrelevant. Some information, especially medical diagnoses,
> that arose after the decision, may shed essential new light on the
> claimant's alleged condition at the time of the ALJ's decision. Such
> information may be "material" within the meaning of the Act.

*Allen-Porter v. Astrue*, No. 10 Civ. 9615(SAS), 2011 WL 6179457 at *6 (S.D.N.Y. Dec. 9, 2011) (footnotes omitted). However, "new evidence indicating only that the plaintiff's condition has worsened since the ALJ's decision does not meet the materiality requirement." *Felix v. Astrue*, No. 11–CV–3697 (KAM), 2012 WL 3043203 at *12 (E.D.N.Y. Jul. 24, 2012) (citations omitted).

Here, the new evidence does not relate to the period on or before the ALJ's decision, because it is dated after the decision and does not refer to Plaintiff's condition prior to issuance of the decision. Rather, it relates to a period, beginning more than three months after the ALJ's decision, during which Plaintiff's condition allegedly worsened. The focus of the evidence (treatment records) is on Plaintiff's worsening alcohol abuse. (*See, e.g.*, 33). For example, whereas Plaintiff had previously admitted to using alcohol sporadically, on December 1, 2014, she reportedly indicated that she was becoming intoxicated on alcohol "every other day," and she "assess[ed] her primary mood problem to be related to alcohol use." (80). When not drinking, her level

16

of depression, on a scale of zero-to-ten, with zero being no depression and 10 being the worst depression, was "near zero." (80). Accordingly, the Appeals Council did not err by declining to consider the evidence. (2).

Nor does the Court find, in any event, that the evidence "undermines" the ALJ's treatment of Dr. Morse's opinion. The ALJ was absolutely correct in observing that Dr. Morse's report was inconsistent with the reality of the situation -- that Plaintiff was gainfully and even happily employed -- at the time it was written. Significantly, Dr. Morse admitted as much in her office notes written on November 18, 2013, just *four days* after she wrote the report upon which Plaintiff relies. Specifically, on November 18, 2013, Dr. Morse saw Plaintiff for the first time since their last office visit on August 26, 2013. In August 2013, Plaintiff had been complaining that her medications were no longer helping her depression, and Dr. Morse, who had only just begun treating Plaintiff, along with Dr. Privitera, were attempting to adjust the types and dosages of her medications, without success. (873-899). Consequently, when Morse wrote her report on November 14, 2013, she had not seen Plaintiff for several months, and was under the impression that Plaintiff's condition remained unchanged. For that matter, when Morse wrote the report she was also obviously unaware that Plaintiff had started a full-time job a month earlier. In light of these facts, it is completely understandable why Morse expressed the opinions in her report.

However, on November 18, 2013, Morse examined Plaintiff again and noted that she had made a remarkable "turnaround" on the newly-adjusted medications. (900-901). Indeed, Morse reported that Plaintiff "[f]eels things have turned around. [She is s]table on current regimen[ and d]oes not feel a need to return to [the] psychiatrist."

(900). Morse further noted that Plaintiff was neither nervous nor anxious, and had a normal mood and affect. (900). Morse also reported that Plaintiff was employed and "get[ting] a lot of exercise." (900). In sum, Morse's own office notes support the ALJ's finding that Morse's prior report was entitled to little weight.

CONCLUSION

Plaintiff's application for judgment on the pleadings [#10] is denied, and Defendant's cross-motion [#13] for judgment on the pleadings is granted. The action is dismissed.

So Ordered.

Dated: Rochester, New York
     September 6, 2017

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge